## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

<table>
<tr><td>

UNITED STATES OF AMERICA,<br>
        Plaintiff,<br><br>
      v.<br><br>
ALISON GU, a/k/a ALISON LING,<br>
        Defendant.

</td><td>

Docket No. 2:16-cr-84-1

</td></tr>
</table>

### REPLY TO GOVERNMENTS' RESPONSE (DOC. 474)

Petitioner respectfully submits this Reply in further support of her July 7, 2025 motion under 28 U.S.C. § 2255 (472) for ineffective assistance of counsels (IAC), and in response to the Government's opposition (474).

In the opposition, the Government identifies five (5) categories of evidence it claims establish guilt beyond a reasonable doubt. But each is either misleading, circumstantial, or would have been rebutted had trial counsel fulfilled her constitutional obligations.

Petitioner's Supplemental Memorandum (472) set forth unrebutted grounds supporting her claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). This Reply elaborates on the prejudice arising from trial counsel's failures - both procedurally and substantively - and demonstrates why, should the Court deny relief, a Certificate of Appealability (COA) is warranted. COA standards are discussed alongside each claim and its IAC significance to preserve the appellate record and highlight the systemic irregularities that infected both trial and post-conviction proceedings.

1

## I.    GOVERNMENT'S MISCHARACTERIZATION OF RULE 8 HEARING

The Government argues that Petitioner should have taken full advantage of the June 23, 2025 Rule 8 hearing to present over 200 pages of factual and exculpatory evidence. This argument ignores both the record of procedural distortion and the sustained pattern of deficient and manipulative representation. Without court-appointed counsel, and in a setting marked by irregular scheduling, unanswered motions, and an atmosphere of hostility, Petitioner was not in a position to safely or effectively present witnesses or exhibits without risking further prejudice.

Every phase of Gu's post-conviction litigation was distorted by cumulative misconduct:

•    LBS suppressed key exculpatory witnesses, manipulated trial narrative, and lied under oath about witness accessibility.

•    Mary Nurino set up Gu's autistic son, Philip, for immediate dismissal with a question she knew he could not answer (381, p. 139, line 1-11).

•    Mark Oettinger misled both Petitioner and the Court, staging a coercive courtroom scene (442 Memo ¶17 and Affidavit §B3) and justifying his evidentiary omissions with explanations that were inaccurate or pretextual - including the false claim that Mr. Gu's August 15, 2022 letter referenced unrelated charges (it did not) (456, ¶7; 472, Exh. AC), and the unexplained exclusion of multiple other defense materials such as Petitioner's impact statement, work performance, partner reference (472 §§ V.A, V.D).

This context explains why critical testimony and documents were only submitted post-hearing. For example, the Government's challenge to Mr. Gu's affidavit (474, pp. 4–5) is meritless and rests on a mischaracterization. Mr. Gu's postponing in submitting a sworn affidavit stemmed from his deep distrust of the judicial process after witnessing the Court's repeated disregard for Petitioner's motions and the shocking accusation of perjury leveled against both Petitioner and her

children following their testimony at her supervised release violation hearing. Without appointed counsel to verify the contents or to ensure proper submission channels, Mr. Gu was understandably hesitant to participate further in a process that had historically marginalized Gu's defense.

Importantly, Mr. Gu had, in fact, expressed concerns about trial counsel Lisa Shelkrot as early as October 2018 in a draft letter to attorney Natasha Sen (Exh. A). That draft - edited at Sen's instruction to remove criticism of LBS - was ultimately submitted in redacted form (472, Exh. AP, pp. 28-32). His July 2025 affidavit (472, Exh. A) reaffirms those early concerns and reflects his retrospective realization that his trial appearance had been orchestrated not to support Petitioner, but to facilitate a subtle but highly prejudicial identification ploy.

As he now understands, he was called primarily to confirm a family photo (301, Trial Exh. 353) during Drescher's cross-examination (301 Trial Tr. V5, pp. 200–201), a tactic used to evoke a visual link between that image and the fraudulent New Hampshire license bearing Gu's likeness. Petitioner had already explained on direct that the DMV photo was indeed hers - but clarified that she had been duped into attending the DMV to help someone pass a road test, not to obtain a license for herself (301 Trial Tr. V5, pp. 112–116). Neither Petitioner nor Mr. Gu recalls providing the family photo to trial counsel or being told where it originated. LBS never objected to its introduction nor questioned its provenance. The Government's weak identification theory - unsupported by any witness linking Petitioner to the passport agency video - thus relied heavily on Mr. Gu's perceived recognition of a still image, creating a subconscious association in the minds of the jury. With no corroborating witnesses allowed to testify, Mr. Gu's good-faith appearance became, in hindsight, the linchpin that allowed the jury to infer guilt from appearance alone.

The result: multiple critical witnesses - including Susan Randall and Philip Russell - refused to cooperate, while the Government used Gu's pro se posture to accuse her of falsifying hundreds of pages of digital evidence with no substantiation. Repeated denials of counsel (Docs. 442, 461, 468), inconsistent rulings (Docs. 444, 464), and strategic use of the "successive petition" label to delay (409, 412, 438), confusion in motion sequences and delayed filings (444, 447, 450, 451, 453, 456, 457) collectively rendered the June 23 hearing unsuitable for meaningful fact-finding.

The Government's assertion that the Court "should not credit, or assume authentic, any statements or documents Gu submits" and its accusation that Petitioner is "attempt[ing] to fabricate new evidence" (474, p. 7) are not only inflammatory but legally and factually indefensible.

Petitioner's exhibits in ECF 472 include notarized affidavits, timestamped emails, official court filings, trial transcript citations, and documented interview summaries - many of which are supported by government-disclosed records or produced during trial. These materials are not "fabricated"; they are corroborated by the record or verifiable through discovery.

The Government's assertion that Petitioner fabricated evidence - including the Jenny The interview and Jackie Chan's affidavit - is unfounded. Exhibit J of 472 reflects an annotated record prepared by Investigator Susan Randall, not Petitioner. Randall's contemporaneous notes, showing that Jenny identified "Yuki", not Petitioner, as the person in the passport agency, corroborate Petitioner's consistent identity defense. Likewise, Chan's affidavit (472, Exh. AT), executed on July 11, 2025, aligns with pre-existing trial records and LBS's own trial preparation emails. To imply falsification without confronting the substance of these documents is a tactic of evasion, not refutation.

The Government further claims that Petitioner "failed to produce a single live witness," while simultaneously opposing every request for court-appointed counsel (442, 461, 468), ignoring documented instances of witness suppression (Jenny, Jackie Chan, Matthew Abel), and mischaracterizing the Rule 8 hearing as a venue where Gu could safely litigate complex facts pro se.

The Government's rhetoric is an attempt to deflect from its own reliance on unchallenged circumstantial evidence, and it disregards the structural barriers Petitioner faced at trial and post-conviction - including the obstruction of key witnesses and the Court's repeated failure to enforce adversarial fairness.

## II.    SYSTEMIC TRIAL COUNSEL FAILURES UNDERMINING IDENTITY AND AUTHORSHIP DEFENSES

### A. <u>Procedural Irregularity in Handling Passport Video</u>

One of the most consequential failures in Petitioner's trial was the treatment of the St. Albans passport office surveillance video - marked as Government Exhibit 18 on the trial transcript (297, V1, p. 162). Despite being introduced into evidence, the Government chose to present only two still-frame enlargements from the video to the jury, rather than the full footage. Trial counsel Lisa Shelkrot neither objected to this selective presentation nor moved to admit the full video for context.

This omission is particularly damaging because the complete video would have shown that the person depicted was plainly not the Petitioner - a fact Petitioner has consistently maintained. More troubling, Shelkrot affirmatively chose to keep the existence of the full video concealed from Petitioner's father, who testified but was never questioned about the footage. He later confirmed

he had no idea it even existed. According to Petitioner's post-conviction filings, this was a deliberate strategy by Shelkrot to maintain secrecy over what should have been the single most exculpatory piece of evidence in the case.

Petitioner had repeatedly raised the issue of mistaken identity with both Shelkrot and her first appointed counsel, David McColgin. The mishandling of the video appears consistent with a broader pattern of suppressing identity-based defenses - potentially the result of off-channel communications between Shelkrot and the Government. This inference is bolstered by the fact that no experts or corroborating witnesses were allowed to review the video and testify, and no motion was filed to compel the Government to play the complete exhibit.

No expert was retained to examine the video. No third-party witnesses except Jenny when she was asked to identify a still image during an interview - to which she affirmed the person was "Yuki". Instead, Shelkrot dismissed Jenny as a key witness and left the Government's suggestive and misleading use of two still images entirely uncontested.

This failure reflects a breakdown not only in adversarial testing of the Government's evidence, but in the basic duty of defense counsel to present readily available exculpatory material. It also reflects a deeper procedural irregularity - the passive allowance of prosecutorial cherry-picking from admitted video evidence without judicial or defense challenge.

***IAC Significance:***

1. <u>Not Reasonable</u>: No strategic evaluation was recorded or communicated to Petitioner. Despite multiple requests, Shelkrot failed to present the full video or consult any expert. Petitioner father's testimony could have offered direct identification but was never activated.

2. <u>Not a Strategy</u>: Suppressing the only visual evidence tied to the Government's identity theory - while allowing only selective stills - defies any plausible defense rationale. There is no documentation or justification in the record.

3. <u>Probability of Different Outcome</u>: Extremely likely. Identity was a central issue. The full video, combined with eyewitness clarification, would have directly rebutted the Government's theory and likely produced a reasonable doubt verdict.

***COA Relevance:***

Reasonable jurists could debate whether trial counsel's failure to contest the Government's selective use of the passport video and refusal to present the full footage to the jury amounted to ineffective assistance. It also raises concerns of evidentiary suppression under *Kyles v. Whitley*, 514 U.S. 419 (1995), and *Strickland*, given that the omitted evidence went to the core of Petitioner's identity-based defense.

## B. Evidence from Search of Gu's Residence

The Government relied heavily on materials allegedly found in Gu's Cheshire, Connecticut home - specifically, fake identification documents and tools used to forge Alabama probate court orders. These items formed the evidentiary basis for linking Gu to both the passport fraud and identity fraud schemes.

Yet no forensic evidence was offered to prove that Gu authored or handled these materials. No fingerprints or handwriting analysis were introduced to establish authorship. The items were accepted at face value, without scientific scrutiny.

Gu has consistently stated that individuals such as Bo, CC, and Yuki had unsupervised access to her home and digital devices. Yet trial counsel failed to investigate these third-party

actors, pursue any forensic analysis, or introduce digital evidence to challenge the Government's exclusive-possession theory.

Trial testimony from Scott Rodgers confirmed that law enforcement did not take photographs documenting the precise locations where the alleged items were found (299, Trial Tr. V3, pp. 86–98). This omission raises doubt as to chain-of-custody and authenticity. Jenny's pretrial interview notes offered plausible explanations for how some of the seized materials could have ended up in the residence. However, she was dismissed by the defense after investigator Susan Randall reported she seemed confused on other unrelated facts - a basis that should have been weighed by the jury, not unilaterally by counsel.

To further distract the jury from the lack of forensic documentation, the Government introduced seven unrelated photographs of Gu's Cheshire home (299, V1, Trial Exhs. 41–47), depicting pool, backyard, outdoor kitchen and barbecue, with no connection to the allegedly seized evidence. Rather, their effect was to distract and psychologically influence the jury by associating affluence with culpability. None of these exhibits were objected to by trial counsel.

In addition, Gu advised trial counsel that federal agent Jeremy Stella had previously attempted to lure her into wiring money under false pretenses via the Bank of Bennington, in order to manufacture probable cause for the later search warrant (442 Memo §12, iii; 442 Affidavit ¶7; 472, VII.C, §3). This attempted entrapment undermines the legitimacy of the search entirely. Despite being told of this, Shelkrot did not investigate or raise the issue at trial. Nor did she incorporate it into her closing argument or submit any motion to suppress. These failures left the possibility of planted evidence entirely unaddressed.

Further compounding this omission, Agent Jeremy Stella - the lead federal investigator - was not only the person who conducted the search of Gu's residence but also the one who claimed

to have personally discovered the allegedly fraudulent materials – a fact that could be confirmed by Scott Rodgers who testified. Despite his central role in the case and being listed on the Government's original witness list, he was never called to testify. As noted in ECF 470, the Government offered no explanation for his absence. This denied the jury any opportunity to evaluate the legitimacy of the search, the credibility of the agent's account, or whether his handling of the evidence was proper and reliable.

The forgery tools - allegedly linked to fabricated court orders - were likewise never subjected to expert review. Gu denied knowledge of the materials and offered a plausible theory of third-party access. Still, trial counsel did not call any household witnesses or even raise the issue during closing.

Together, these errors permitted the Government to construct a circumstantial narrative that relied entirely on location, not authorship. The jury was given no basis to consider an alternative explanation.

### *IAC Significance:*

1. <u>Not Reasonable</u>: Trial counsel failed to investigate authorship, pursue forensic testing, or challenge the foundational reliability of the search. Despite being told about Agent Stella's prior entrapment attempts, no motion to suppress or inquiry was made. Trial counsel also failed to object to seven unrelated photographs of Petitioner's home whose only effect was to associate affluence with culpability. Their admission, unchallenged by counsel, reinforced a prejudicial narrative disconnected from the evidentiary issues in dispute.

2. <u>Not a Strategy</u>: There is no documented justification for the failure to challenge the chain of custody or absence of forensic review. The exclusion of Stella from the witness list and failure to call household witnesses cannot be explained by a coherent defense strategy.

3. <u>Probability of Different Outcome</u>: Extremely likely. The Government's narrative relied entirely on the assumption that materials found in Gu's home were hers. Undermining that link - through forensics, third-party testimony, or suppression arguments - would have altered the jury's view of authorship and intent.

### *COA Relevance:*

Failure to challenge the origin and authorship of these critical exhibits - despite available forensic tools, witness statements, and third-party culpability theories - demonstrates constitutionally deficient performance. Reasonable jurists could debate whether proper investigation and presentation of third-party access and digital forensics would have changed the outcome under *Strickland* and *Kyles*. They could likewise debate whether the jury's unchallenged exposure to unrelated images of affluence improperly influenced its perception of guilt. This evidentiary failure, layered atop an unchallenged circumstantial case, reinforces the Strickland prejudice and warrants further review.

### C. Real Estate Allegations, Danbury Impeachment, and Unused Defense Witnesses

The Government asserted that Gu admitted to purchasing properties financed through fraudulent mortgage applications to show knowledge and intent. However, Gu testified only to purchasing the Cheshire property, financed with legitimate proceeds from the sale of the Park Avenue townhouses. She denied knowledge of any false applications, which were signed by Abel, Chen, or Shao - not Gu. She also testified that she was targeted by others attempting to

misappropriate her assets, and that a former restaurant manager, Yuki, had once tried to impersonate her to sell Park Avenue units (301, Trial Tr. V5, p. 136, line 12-21).

Defense counsel, Lisa Shelkrot, never presented this full narrative. She failed to call Jackie Chan, Gu's real estate attorney, who handled closing documentation and could have explained that the transactions were legal and the loan proceeds were used to satisfy valid liens (472, Exh. AT). Amy Chen, the closing attorney, was also not called to address chain-of-custody or authenticity issues regarding documents the Government relied on.

The issue was compounded by the Government's reference at trial to a prior Danbury real estate case (Park Avenue Commons, LLC), where it implied a pattern of deceit and misuse of funds. While the Danbury charges had been dismissed, trial counsel never rebutted this line of impeachment, never objected, and failed to present Philip Russell, Gu's attorney in that case. Russell had referred Gu to a New York firm that uncovered Chinese court records showing Lida Han - a central figure in both the state and federal investigations - was convicted overseas for fraud and EB-5 abuse. This evidence was shared with the federal team in 2017 and later used to get the Danbury charges dismissed, but it was withheld from the jury entirely.

Shelkrot later claimed in her affidavit that Russell's information was not "material," but this contradicts the record. Han was connected to Allen, Bo, and CC - all individuals whose names surfaced across both prosecutions. The failure to present Han's fraud history and expose her as a common link stripped Gu of her most powerful impeachment evidence. The jury was left to assume Gu was a repeat offender rather than someone misrepresented and scapegoated by actual perpetrators.

Gu's right to present a complete defense was obstructed not by lack of evidence but by counsel's unwillingness to present it.

*IAC Significance:*

1.    <u>Not Reasonable</u>: Shelkrot had access to legal professionals (Chan, Chen, Russell) and documents that would have rebutted the Government's theory. Their exclusion - without factual inquiry or strategic balancing - was unreasonable.

2.    <u>Not a Strategy</u>: Shelkrot offered no individualized rationale for dismissing each witness. Her failure to present evidence of Han's conviction used successfully in state court (472 Exh. R) or to frame Gu's real estate actions lawfully shows a blanket refusal to develop the defense case.

3.    <u>Probability of Different Outcome</u>: Extremely likely. The Government's theory hinged on inferences of intent and pattern fraud. Had Russell impeached Han and Chan testified to Gu's legitimate conduct, the jury's view of Gu's intent and credibility would have shifted significantly.

*COA Significance:*

This combined set of failures illustrates a breakdown in adversarial testing and factual presentation. Reasonable jurists could debate whether Gu's Sixth Amendment rights were violated by trial counsel's failure to present legal witnesses, rebut impeachment by showing Han's fraud history, and distinguish lawful transactions from alleged fraud. At minimum, it raises doubts about whether the verdict would have remained the same had even one of these witnesses testified.

**D.  Failure to Present Matthew Abel as a Witness**

The Government defends trial counsel's decision not to call co-defendant Matt Abel, stating that Abel had pleaded guilty and admitted under oath that he helped Gu obtain fraudulent loans using false identities. (474, p. 6).

But this ignores the context and potential utility of Abel's testimony under the Joint Defense Agreement (JDA) in place before trial. According to Petitioner's post-conviction filings (472, Exh. G), Shelkrot originally planned to call Abel to corroborate Petitioner's defense - particularly that certain accounts, applications, or financial communications were prepared and submitted by Abel alone. In fact, two days before Petitioner testified, Shelkrot falsely told Mr. Gu that the defense strategy was to blame Matt Abel - despite never having pursued that theory or laid any evidentiary groundwork to support it. This misrepresentation occurred the same day Shelkrot pressured Petitioner to take the stand but never suggested to use Abel as a strategy, further compounding the prejudicial impact of Abel's exclusion (442, ¶15; 472, IV.C, VII.B, Exh. V). Petitioner was never informed that Abel would not be called. No strategic explanation was offered, and nothing in the record indicates any risk analysis was done. Abel's plea did not prevent him from testifying truthfully that Gu had no knowledge of certain transactions and that he took independent action in assembling loan files.

Most critically, Abel had specific knowledge that could have materially supported Petitioner's trial defense:

• He could have identified the woman in the St. Albans passport office surveillance video (whom Gu denies being);

• He had personal knowledge of who lived in the Cheshire residence at the time the fraudulent documents were allegedly found;

• He could have confirmed or rebutted whether others had access to shared household devices.

Evidence shows that Shelkrot's decision to abandon Abel occurred long before the unexplained withdrawal of other favorable witnesses (e.g. Jenny The, Jackie Chan). Yet despite the early omission, the opportunity to re-engage Abel as a defense witness - even at the last minute - could have dramatically altered the outcome of Gu's trial.

This omission took on even greater consequence when viewed against the jury's evident confusion during deliberations, as reflected in the two written questions they submitted to the Court about whether someone else could have been the principal actor and how aiding and abetting applied to Gu's case. These questions, discussed in ECF. 472 VII.F (also see 302, Trial Tr. V6, p. 132, line 6-16), confirm that jurors were unsure how to weigh Gu's role in the alleged scheme and whether alternative explanations had been credibly presented.

Had Abel testified - clarifying his own actions and Gu's lack of knowledge regarding key aspects of the fraud - it may have resolved these doubts. Trial counsel's failure to offer any such clarification left that uncertainty unaddressed. This moment illustrates prejudice not just under *Strickland*, but also under *Kyles*, which requires courts to assess cumulative suppression and its impact on verdict reliability. Had the jury heard even one of the omitted witnesses, its verdict would have changed.

### *IAC Significance:*

1.  <u>Not Reasonable</u>: Trial counsel abandoned Abel early in the case without documenting any risk-benefit analysis or reassessing his value after the guilty plea. Abel had firsthand knowledge critical to Gu's defense, and his testimony could have clarified authorship, access, and identity issues central to the Government's theory.

2.     <u>Not a Strategy</u>: No strategic rationale for Abel's exclusion was ever articulated in the trial record or post-conviction filings. The omission appears arbitrary, especially considering that Abel remained available, was previously included under a Joint Defense Agreement, and maintained personal knowledge of disputed facts.

3.     <u>Probability of Different Outcome</u>: Very likely. Juror questions during deliberation reflected confusion about Gu's role and whether another individual could have been the principal actor. Abel's testimony would have directly addressed this uncertainty and bolstered the alternative theory of third-party authorship and execution.

*COA Relevance:*

The exclusion of Matthew Abel - a co-defendant with direct knowledge of the transactions at issue - raises a substantial constitutional question under *Strickland* and *Kyles*. Abel could have provided first-hand testimony regarding the origin of financial documents, use of digital devices, and presence of third parties at Gu's residence. His testimony would have directly supported Gu's mistaken identity defense and contradicted key elements of the Government's narrative.

The jury's questions during deliberation about whether someone else could be the principal actor reflect precisely the uncertainty Abel's testimony could have resolved. Trial counsel's failure to present him, despite prior plans and his continued availability, deprived the jury of essential context. Reasonable jurists could debate whether this omission undermined confidence in the verdict, particularly in a case resting on circumstantial inferences rather than direct evidence of Gu's intent.

### E.  Misrepresentation and Exclusion of Jenny The

Both the Government and defense counsel mischaracterized or dismissed Jenny The - an eyewitness who could have provided critical context to Gu's identity-based defense and to the presence of third parties in Gu's household. Jenny was a longtime domestic worker who knew key individuals including Gu's ex-husband Allen, and had knowledge of the routines and access patterns at the Cheshire residence.

On October 17, 2017, Jenny was shown several images by defense investigator Susan Randall. Among them was a still image from the passport agency surveillance video and a photo from a New Hampshire driver's license. According to annotated notes (472, Exh. J), Jenny identified the surveillance image as "Yuki," not Gu, supporting Petitioner's longstanding defense of misidentification. Jenny correctly identified the driver's license photo as Gu, which Gu herself admitted during trial - consistent with the explanation that she was lured to the DMV by co-conspirators exploiting internal access.

The Government's argument in ECF. 474 mischaracterizes these identifications and further claims that Jenny's failure to identify Gu in the surveillance image would only undermine her credibility. This flips the logic of exculpatory evidence on its head. The misidentification of the surveillance image is the very reason Jenny was relevant to the defense.

Despite Jenny's critical value as a long-time household employee familiar with the individuals and context central to Gu's defense, she was ultimately excluded from testifying. Jenny had traveled to Burlington with the intent to appear, meeting with Attorney Shelkrot shortly before trial. Although her daughter raised concerns about immigration consequences, Jenny remained willing to testify and communicated her desire to help (472, Exh. M). Nevertheless, Shelkrot withheld her from the stand and later falsely claimed - under oath in her 2025 affidavit (453, ¶¶

46, 54) - that Jenny was never present in Burlington. This claim is flatly contradicted by Exhibit V of ECF. 472 (Petitioner's recorded conversation with Shelkrot confirming Jenny's presence) and corroborated by Mr. Gu's affidavit (472, Exh. A), which details Jenny's travel arrangements, hotel stay, and courthouse presence. The decision to suppress a fact witness on superficial grounds - such as alleged confusion over a fish tank, as noted by Investigator Randall - without disclosing Jenny's readiness to testify, deprived the jury of material exculpatory evidence and reflected both a credibility issue in counsel's post hoc justifications and a failure of constitutional magnitude.

### *IAC Significance:*

1.    <u>Not Reasonable</u>: Jenny was a longtime domestic worker with firsthand knowledge of the household, the individuals involved, and key identity-related facts. Her willingness to testify and the specificity of her identification were known to counsel, making her exclusion objectively unreasonable.

2.    <u>Not a Strategy</u>: Shelkrot's stated rationale - Jenny's confusion about unrelated household details - was not sufficient grounds to suppress critical eyewitness testimony. Her later sworn denial that Jenny was even present at trial further undermines any claim of legitimate strategic discretion.

3.    <u>Probability of Different Outcome</u>: Very likely. Jenny's testimony could have directly rebutted the Government's core visual-identification theory by affirming the person in the passport video was not Gu. Her presence would have supported a third-party culpability theory and corroborated Gu's consistent defense of mistaken identity.

*COA Relevance:*

The misrepresentation and exclusion of Jenny deprived the jury of a key fact witness who could have undercut the Government's circumstantial narrative and directly supported Gu's defense. Her testimony would have placed others - not Gu - at the center of the fraudulent activity. Reasonable jurists could debate whether the failure to call Jenny constituted ineffective assistance that undermined confidence in the verdict.

## F. Conflated Loan Applications and Overlooked Bench Trial Request

The Government's reliance on superficial similarities across multiple mortgage applications - none of which list Petitioner as the applicant - formed a central yet flawed pillar of its case. Despite asserting that the applications collectively show a pattern linking Gu to mortgage fraud, the Government failed to present direct evidence of authorship or participation. All contested applications were filed under the names of Abel, Chen, or Shao, while Gu's own property - her Cheshire residence - was purchased outright with lawfully obtained proceeds from the Park Avenue sale. The Government omitted this distinction, misleadingly implying Gu's involvement based on document aesthetics rather than fact.

Trial counsel's failure to rebut this inference allowed the jury to conflate unrelated transactions. No forensic document expert was called to assess authorship, and no rebuttal witnesses were introduced to confirm the true preparers of the applications. Nor did counsel challenge the admissibility or weight of these exhibits, which went untested despite their circumstantial nature. Counsel likewise failed to object to the Government's insinuation that structural similarities alone were probative of guilt - despite knowing these documents bore no traceable connection to Gu.

Worse still, trial counsel did not act on Petitioner's repeated request for a bench trial, citing the legal complexity of real estate law and the risk that lay jurors might misunderstand the distinction between Gu's lawful actions and her co-defendants' alleged fraud. In contemporaneous emails and an October 2017 communication, Petitioner explicitly proposed that Judge Reiss - who had adjudicated related matters - was better positioned to evaluate such nuance (472, Exh. I). Yet no motion under Rule 23(a) was filed, confirmed by the government on the June 23rd hearing (468, p. 14, line 23-25, and p. 15, line 1-2) and no consent was ever sought from the Government.

Instead, in closing arguments, counsel invited the jury to draw inferences from numerical summaries and visual layouts of mortgage paperwork without ever contextualizing the legal differences between "constructive fraud," "equity protection," or ownership-based borrowing. This left the jury to navigate a field of complex legal and financial facts with no tools or expert guidance - effectively substituting implication for proof.

Together, the failure to contest the mortgage evidence and the unexplained dismissal of a bench trial option undermined the fairness and accuracy of the proceedings. These omissions not only prejudiced Petitioner under *Strickland* but also raise substantial constitutional questions under Rule 23. Reasonable jurists could debate whether a bench trial, supplemented with expert analysis and basic rebuttal, would have yielded a different outcome - especially given that the Government's loan theory lacked direct proof and rested entirely on circumstantial presentation.

### *IAC Significance:*

1.    <u>Not Reasonable</u>: Counsel failed to dispute the Government's key inference - that loan application similarities proved Gu's authorship - despite knowing that none of the applications bore her name. No forensic expert was retained, no rebuttal witnesses were called, and no

evidentiary motion was made to challenge the credibility or admissibility of this circumstantial claim.

2.    <u>Not a Strategy</u>: Trial counsel provided no affidavit or in-court rationale for failing to distinguish Gu's cash purchase from co-defendants' mortgage activity, nor did she explain why the bench trial proposal was never pursued. These were not tactical omissions - they reflected absence of preparation and refusal to explore defense-favorable alternatives.

3.    <u>Probability of Different Outcome</u>: Very likely. A bench trial would have permitted the Court to evaluate legal complexity and evidentiary nuance without relying on lay inference. A forensic expert or corroborating witness could have dismantled the Government's stylistic similarity theory. Reasonable jurists could debate whether either omission - on its own - undermines confidence in the verdict.

*COA Relevance:*

The jury was allowed to treat stylized loan similarities - unsupported by forensic or testimonial linkage to Petitioner - as circumstantial proof of guilt. Trial counsel's failure to contest this narrative or clarify the distinction between Gu's cash purchase and others' mortgage activity deprived the jury of critical context. The resulting misperception was avoidable.

Likewise, counsel disregarded Petitioner's repeated requests for a bench trial, despite clear indications that judicial evaluation of complex legal and financial concepts - such as "constructive fraud" or asset-based lending - would have minimized jury confusion. No Rule 23(a) motion was filed, and no effort was made to obtain the Government's consent.

These dual omissions - failing to rebut misleading circumstantial evidence and neglecting a more appropriate trial format - underscore the depth of prejudice. Reasonable jurists could debate

whether these lapses, individually or cumulatively, undermined confidence in the verdict and merit further review under *Strickland* and Rule 23.

### G. Trial Record Context for Evaluating Prejudice:

Government presented 30 witnesses and introduced 107 exhibits - virtually all circumstantial in nature. In stark contrast, defense presented only 3 witnesses (plus the defendant) and submitted just 3 exhibits. This imbalance highlights the degree to which defense counsel failed to test or counter the Government's narrative, reinforcing the prejudice under *Strickland*.

One of the clearest illustrations of this imbalance was the handling of the passport office surveillance video. Although introduced into evidence as Trial Exhibit 18, the Government selectively showed only two enlarged frames rather than the full footage. Trial counsel Lisa Shelkrot did not object or move to admit the complete video, despite Petitioner's repeated insistence to both Shelkrot and her first appointed counsel, David McColgin, that the video proved mistaken identity. Petitioner's father, who took the stand, was never informed of the video's existence and thus could not provide identification testimony. This suppression - combined with evidence suggesting that the strategy was deliberate and potentially coordinated off-record between Shelkrot and the prosecution - resulted in the exclusion of the one piece of evidence most likely to exonerate Petitioner on the identity issue.

Another critical imbalance involved the disappearance of Agent Jeremy Stella - the lead federal investigator on the case. Stella was physically present at Gu's residence during the search and is the agent who allegedly discovered the evidence of fake IDs and stamping tools the Government relied upon at trial. He was listed on the Government's original witness list but was never called to testify, and no explanation was given. As discussed in ECF. 472, his absence

prevented the jury from assessing the legitimacy of the search, chain-of-custody, or investigative methods. Petitioner has further alleged that Stella previously attempted to entrap her via a wire transfer scheme through the Bank of Bennington - an effort intended to fabricate grounds for the search warrant itself. Despite being briefed on this history, trial counsel made no motion to suppress or impeach the basis of the search. The combination of Stella's removal and the lack of cross-examination or evidentiary challenge points to a deeper irregularity, possibly including undisclosed or ex parte communication between the Government and defense counsel that insulated Stella from scrutiny and deprived the jury of essential context.

Further suggesting irregular coordination, an October 28, 2017 email from Gu to Shelkrot documented that ADA Michael Drescher directly asked for Shelkrot's personal cellphone number during trial preparation. (Exh. B). This request - delivered outside official filings or courtroom channels - raises serious concerns about undocumented ex parte contact between the prosecution and defense. At a minimum, it supports the inference that trial counsel may have prioritized informal access over adversarial advocacy, especially in light of her failure to object to evidentiary irregularities or preserve key defense requests. In the context of Stella's unexplained removal, the exclusion of the full passport video, and the absence of defense witnesses, this personal outreach further undermines the reliability of the trial's adversarial structure.

### G1. Judicial Conduct and Court-Enabled Misconduct

This section refrains from alleging judicial misconduct directly. Instead, it establishes how the Court's inaction or permissiveness enabled a pattern of off-record coordination between the Government and defense counsel, contributing to ineffective assistance of counsel and prejudicial denial of constitutional protections.

- *2019 Denial of Matthew Abel's Surrender Delay* (2:16-cr-00084-cr-2, Doc. 304 & 307): Despite his role as caregiver for Gu's minor children and adult son with ASD, the Court denied Abel's motion to postpone his six-month brief custodial sentence so Gu could serve hers first. The ruling (via text orders) left the children without parental supervision for nearly a year. Two minors developed anxiety and depression, while Philip - autistic and left unsupervised - faced additional criminal exposure that led to profound challenges and lasting consequences. Abel's attorney, Craig Nolan, considered the denial highly unusual. Based on Gu's experience assisting other inmates with legal filings during incarceration, she learned it was not uncommon for white-collar defendants to postpone surrender for extended periods - sometimes years - due to professional, familial, or personal obligations, even in cases involving millions in financial loss. Abel's six-month sentence and his role as sole caregiver made the denial here all the more atypical.

- May 13, 2022 Hearing (Doc. 369): Judge Reiss suggested that the Government submit Gu's trial transcript to support its SRV allegation. This judicial prompt arguably altered the adversarial posture and reflects a pattern of procedural imbalances that bolstered Government strategy.

- *May 26, 2022 Hearing* (Doc. 380): The Court questioned the authenticity of Gu's text message to her probation officer, implying potential forgery, yet blocked Gu from introducing corroborating screenshots. No formal evidence inquiry followed. The judge's demeanor and assumptions contributed to the sidelining of Gu's exculpatory intent.

- *June 1, 2022 Hearing* (Doc. 381): Gu's son Philip, who has autism, was called to testify. Mary Nurino, aware from prior interaction that he did not know the name of the contractor (Barlow), opened with that question, then dismissed him when he said "no." The Court raised no objection. Gu had previously identified Nurino as ineffective in her original § 2255 (Doc. 407) and

supplemental memo (Doc. 442), but Judge Reiss requested affidavits only from LBS and Oettinger (Doc. 443). This omission, combined with the suppression of Philip's testimony, illustrates a failure to safeguard Gu's right to a fair hearing.

• *June 15, 2022 Hearing* (Doc. 382): Judge Reiss acknowledged improper scheduling of the June 1 hearing due to her misunderstanding of Gu's location. This followed Gu's private email to CJA counsel Oettinger alleging judicial bias (472, Exh. AF), who may have disclosed its contents without Gu's consent - again, reinforcing an atmosphere of undisclosed coordination.

• *August 16, 2022 Hearing* (Docs. 442, 468): Gu appeared early at court and found LBS's supervisor, Mr. Langrock, in a closed proceeding with Judge Reiss. Her motion to attend this hearing remotely was denied, requiring her in-person appearance. Gu described the setup as a calculated courtroom display intended to intimidate her into abandoning her § 2255 petition against Shelkrot and Langrock. Even if the Court was not aware of the special scheduling request placing Langrock's client ahead of Gu, discovery under Rule 6 may reveal communications between the Court, Government, and counsel confirming this was not coincidental.

Together, these events do not allege judicial misconduct per se but instead frame a courtroom environment in which defense counsel and prosecutors may have felt empowered to coordinate informally, ex parte, and outside the adversarial process, to the detriment of Gu's constitutional rights.

*IAC Significance:*

1.    <u>Not Reasonable:</u>

Trial counsel allowed the Government's circumstantial case to proceed virtually unchallenged, failing to introduce competing witnesses, exhibits, or evidentiary objections. The

decision not to show the full passport surveillance video - despite Petitioner's repeated requests - and to keep it from a testifying witness (Petitioner's father) is indefensible. Similarly, no motion was made to suppress or scrutinize evidence from the home search, even when Petitioner alerted counsel that Agent Stella had tried to entrap her.

2. <u>Not a Strategy:</u>

The record contains no explanation or affidavit justifying these omissions. On the contrary, the evidence suggests a pattern of passive or possibly collusive decision-making, including unlogged communication between ADA Drescher and defense counsel. The email requesting Shelkrot's personal cell phone is particularly troubling and undermines the notion that these were reasoned legal choices.

3. <u>Probability of Different Outcome:</u>

Extremely likely. The full passport video - had it been shown to the jury - could have exonerated Petitioner on the central identity issue. The unexplained removal of the agent who "discovered" the most damaging evidence further gutted the defense. If even one of these failures had been remedied - by showing the full video, calling an expert, or scrutinizing the search - confidence in the verdict would be seriously undermined.

***COA Relevance:***

The record demonstrates a trial and post-conviction environment rife with irregularities and unchallenged Government conduct. Petitioner's ineffective assistance claim is not speculative - it is based on specific, documented failures that removed core identity and authorship issues from the jury's evaluation. Reasonable jurists could debate whether a full and fair presentation of the passport video, or even minimal adversarial pushback against the prosecution's search evidence,

would have altered the outcome. These are not minor trial errors - they go to the heart of the adversarial process protected by the Sixth Amendment. A certificate of appealability is warranted.

## III.    THE RECORDS SPEAKS FOR ITSELF: STRATEGIC MANIPULATION, NOT MERE INCOMPETENCE

Through this process, the truth emerged not by accusation, but by pattern. These were not isolated acts of inattention but coordinated acts of suppression:

• LBS denied knowledge of Jenny's availability, lied about Jackie Chan's relevance, lied about not being provided with Jing Shao's information to justify not investigating, and misled Gu's father and the Court.

• Despite knowing the extent of Gu's grievances and the underlying manipulation, Oettinger orchestrated a coercive courtroom display and then failed to file - or even advise Gu to file - character support materials that might have mitigated the flawed SRV outcome and reduced the resulting 10-month sentence and 15-month probation extension.

• In parallel to the two wrongful adjudications - one by jury (177) and one by revocation (390) - at least fourteen (14) of Petitioner's filings (ECF. 316, 318, 327, 340, 347, 374, 383, 394, 396, 418, 458, 460, 461, 469) was either denied or declined to adjudicate by Court; only two (ECF 430 and 439) were granted since Petitioner's convictions. This pattern reinforces the broader procedural imbalance at the heart of her claims.

The Government defends these actions as tactical decisions. But no attorney of sound judgment, professional integrity, or constitutional fidelity would engage in such conduct unless the claim of ineffective assistance was valid. This Court's September 2024 order helped uncover

what these actors tried to bury. The Government's position now stands as the last defense of a structure already revealed to be fatally compromised[1].

In addition, Petitioner respectfully raises concern over an emerging pattern she personally experienced and later observed in others - where defense counsel invokes unsupported or exaggerated mental health narratives as mitigation tools, often without informed consent. Mr. Oettinger's affidavit (456 ¶6) referenced a psychiatric diagnosis he claimed he could "share in greater detail if the Court deems it necessary," despite Petitioner's clear allocution at the June 23, 2025 hearing that she attended only one voluntary session, withdrew immediately, received no diagnosis, and never authorized such disclosure. This tactic - of hinting at unverified psychiatric claims - undermines client autonomy and, in this case, retraumatized Petitioner while shielding counsel from later scrutiny. It reflects a larger trend Petitioner observed while assisting fellow inmates, wherein defense attorneys rely on speculative mental health labels to mitigate sentencing without conducting substantive factual investigation or presenting a full defense.

Petitioner also learned from billing records that Ms. Shelkrot and her investigator were paid by the Court over $80,000 and $40,000 respectively for case appointments spanning approximately six months, though meaningful defense efforts appeared concentrated only in the final two months. These sums underscore the public investment in Petitioner's legal defense and the corresponding expectation of competent, adversarial representation. Petitioner does not raise

---

[1] The Government mischaracterizes both the case law cited and the record itself. Contrary to its assertion, *United States v. Smith*, 870 F.3d 1237 (9th Cir. 2017), is a valid decision concerning flawed identification procedures and the absence of expert rebuttal - a principle relevant here. Petitioner does not equate her circumstances to *Wiggins*, *Rompilla*, or *Nix* based on sentencing posture, but rather invokes their shared holding: where counsel fails to investigate or present readily available mitigating or exculpatory evidence, ineffective assistance may be found. The Government's claim that Petitioner sought to present "fake witnesses" is unsupported by any evidentiary finding. Each witness cited in Petitioner's filings was known to defense counsel, previously vetted, or present at trial but withheld without recorded justification. Reasonable jurists could debate whether this constituted a breakdown in adversarial testing - not mere disagreement with strategy.

this to impugn motives, but to explain why witnesses like Susan Randall - whom Petitioner explicitly said she did not personally fault - may have remained silent in the face of misconduct. This experience deepened Petitioner's understanding that fairness in the legal system requires vigilance when public resources, mental health, and professional duty converge.

### Exhibit Index and Scope of Ineffective Assistance Claim

To aid the Court's review, Petitioner respectfully attaches an Exhibit Index, appended to the previously filed Exhibit Appendix (472), along with later-submitted Exhibit AT (Affidavit of Jackie Chan) and two additional exhibits included with this filing. The Index catalogues factual and evidentiary materials supporting each of Petitioner's ineffective assistance claims, including omitted witness statements, misrepresented affidavits, improperly excluded documents, and critical communications. Together, these materials establish a comprehensive pattern of defense failures - both strategic and procedural - that affected the outcome of trial and sentencing. The Index further illustrates that Petitioner's claims are neither speculative nor isolated, but rooted in documented records and corroborated by third-party sources. The volume and consistency of the omitted or mishandled evidence underscore the strength of Petitioner's constitutional claim under Strickland and reinforce the grounds for granting an evidentiary hearing - or, at minimum, a Certificate of Appealability.

## IV.    Renewed Request for Relief and Conditional Discovery Request

Petitioner respectfully renews her request for appointment of counsel under Rule 8(c) of the Rules Governing Section 2255 Proceedings. If the Court finds the current record - including exhibits and sworn statements submitted with ECF 472 - sufficient to rule without a full evidentiary hearing, counsel can be appointed to assist the Court in verifying witness authenticity, organizing

limited follow-up interviews, and streamlining any final evidentiary supplementation necessary to resolve factual disputes.

Petitioner is prepared to grant full access to the email accounts from which many of the submitted exhibits were obtained to expedite verification. If additional clarification is needed from non-testifying parties - such as Investigator Randall or Attorney Russell - appointed counsel could facilitate limited interviews and submit proffers or declarations in lieu of live testimony.

Should the Court determine that an evidentiary hearing is required, counsel will be necessary to coordinate subpoenas, secure witness appearances (including Shelkrot and Randall), and manage evidentiary presentation consistent with due process.

Petitioner is not presently seeking formal Rule 6 discovery. However, should the Court determine that ex parte or off-docket communication between Government and trial counsel played a material role in the suppression of exculpatory evidence or strategic decisions, Petitioner respectfully reserves the right to seek discovery in aid of verifying such irregularities. Such discovery should be permitted only if it does not substantially delay adjudication.

This conditional request is made in good faith and solely to ensure full and fair adjudication. While Petitioner has previously informed the Court that she does not pursue ineffective assistance claims against Mr. Oettinger and Ms. Nurino at this time, she reserves the right to revisit that position and seek related discovery should her claims against Ms. Shelkrot be denied.

Respectfully submitted on this 23rd day of July 2025.


By:_____/s/ Alison Gu
Alison Gu a/k/a Alison Ling
Pro Se